Lauren M. Rule (ISB # 6863)
ADVOCATES FOR THE WEST
PO Box 1612
Boise ID 83701
(208) 342-7024
(208) 342-8286 (fax)
lrule@advocateswest.org

Attorney for Plaintiffs


## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF IDAHO


| | | |
|---|---|---|
| WESTERN WATERSHEDS PROJECT, | ) | |
| CENTER FOR BIOLOGICAL DIVERSITY, | ) | |
| GRAND CANYON TRUST, and UTAH | ) | Case No. 10-cv-612 |
| ENVIRONMENTAL CONGRESS, | ) | |
| | ) | |
| Plaintiffs, | ) | **COMPLAINT** |
| | ) | |
| v. | ) | |
| | ) | |
| UNITED STATES FOREST SERVICE, | ) | |
| | ) | |
| Defendant. | ) | |


## INTRODUCTION

1.      Plaintiffs challenge Defendant U.S. Forest Service's unlawful practice across

Forest Service Region 4 of reauthorizing livestock grazing on federal land without conducting

the proper environmental review under the National Environmental Policy Act ("NEPA").   The

Forest Service has issued numerous decisions categorically excluding livestock grazing from

NEPA review within Region 4, and Plaintiffs challenge ten of those decisions here.   Such

decisions eliminated meaningful public input and thorough environmental analysis of the

impacts of livestock grazing, which adversely affects imperiled species, important fish and

COMPLAINT - 1

wildlife habitat, wilderness areas, and other valuable natural resources.

2.      Livestock grazing degrades ecological communities such as riparian areas, meadows, sagebrush ecosystems, aspen stands, and grass and forb communities, all of which are critically important habitat for fish and wildlife.  Cows and sheep trample and eat vegetation, compact soils and cause erosion, and degrade water quality.  When livestock degrade this habitat, it impairs the ecological functioning or survival of many fish, wildlife and plant species.

3.      Because grazing causes so many adverse environmental impacts, NEPA normally requires the Forest Service to complete an environmental assessment ("EA") or environmental impact statement ("EIS") before issuing or renewing ten-year grazing permits.  Such review provides for a thorough examination of the impacts of livestock grazing on public land resources as well as an opportunity for the public to comment on and appeal grazing decisions.

4.      At the behest of the Forest Service, however, Congress passed an appropriations rider in 2005 that allows the agency categorically to exclude grazing reauthorizations from NEPA review under certain narrow circumstances.  Specifically, the Forest Service may categorically exclude a decision only if: (1) it does not increase grazing; (2) the Forest Service has monitoring data showing that the grazing is meeting or satisfactorily moving toward applicable ecological objectives; and (3) the Forest Service has demonstrated there will be no significant impacts to certain special resources such as imperiled species, wetlands, wilderness areas, and cultural sites.

5.      Yet the Forest Service has routinely and improperly used this rider as a blank check, frequently relying on it to reauthorize grazing without any EA or EIS even when it has not met the rider's requirements, and in fact when grazing will cause further degradation of resources.  Plaintiffs challenge ten decisions from Forest Service Region 4 forests in Idaho, Utah,

and Wyoming where the Forest Service reauthorized grazing based on an abuse of the appropriations rider.  For instance, the Forest Service has used the categorical exclusion shortcut to "reauthorize" grazing where no grazing or reduced grazing took place for several years prior to the decision, in violation of the first rider requirement. The agency also has categorically excluded many grazing allotment reauthorizations even in the absence of monitoring data to demonstrate that grazing is not preventing the achievement of applicable ecological objectives— particularly data about grazing's impact on sensitive and biologically rich areas and the species that depend on them.  And in numerous decisions the Forest Service acknowledged the presence of special resources, such as endangered, threatened, or sensitive fish, wildlife, and plant species, wetlands, wilderness areas, or cultural sites, but failed to demonstrate that grazing is not harming these resources.

6.      Further, for many of the grazing allotments at issue, the Forest Service either has never conducted any site-specific environmental analysis under NEPA to assess the impacts from livestock grazing, or the only NEPA analysis completed is now many years old—well before scientists recognized many of the adverse effects from grazing, including to species that are now known to be imperiled.  By using the rider quickly to renew grazing permits the Forest Service is trying to escape in-depth environmental analysis and public comment on, or appeal of, its decisions on these allotments, many of which are thousands of acres in size and suffer from significant documented degradation.  Because the decisions challenged here do not meet the requirements of the rider, and will have significant adverse impacts on the environment, the Forest Service has violated NEPA by failing to conduct the appropriate environmental analysis.

7.      Plaintiffs thus seek judicial review and relief reversing and setting aside the decision challenged herein, and further declaratory and injunctive relief to prevent the Forest

Service from continuing to exempt from NEPA decisions that do not meet the requirements of the appropriations rider.[1]

## JURISDICTION AND VENUE

8.      Jurisdiction is proper in this Court under 28 U.S.C. § 1331 because this action arises under the laws of the United States, including NEPA, 42 U.S.C. § 4321 et seq.; the Administrative Procedure Act ("APA"), 5 U.S.C. § 701 et seq.; the Declaratory Judgment Act, 28 U.S.C. § 2201 et seq.; the FY 2005 Consolidated Appropriations Act, Pub. L. No. 108-447, Sec. 339; and the Equal Access to Justice Act, 28 U.S.C. § 2214 et seq.  An actual, justiciable controversy now exists between Plaintiffs and Defendant, and the requested relief is therefore proper under 28 U.S.C. §§ 2201-02 and 5 U.S.C. §§ 701-06.

9.      Venue is proper in this Court pursuant to 28 U.S.C. § 1391(e) because a substantial part of the events or omissions giving rise to the claims herein occurred within this judicial district, a substantial part of the public lands and resources at issue are located within this district, and Plaintiff Western Watersheds Project resides in this district.

10.      The Federal Government has waived sovereign immunity in this action pursuant to 5 U.S.C. § 702.

## PARTIES

11.      Plaintiff WESTERN WATERSHEDS PROJECT ("WWP") is a regional, membership, not-for-profit conservation organization, dedicated to protecting and conserving the public lands and natural resources of watersheds in the American West.  WWP has its headquarters in Custer County, Idaho along with other offices in Idaho, Montana, Utah,

---

[1] Plaintiffs previously challenged these same ten decisions, among others, in a case filed in the Northern District of California, but as part of a stipulated agreement withdrew those challenges without prejudice and without restrictions to refiling them in one or more new cases.  *See Western Watersheds Project v. U.S. Forest Service,* Case No. 08-1460-PJH, Dckt. No. 102 (N.D. Cal. Aug. 24, 2010).

Wyoming, Arizona, and California, and has more than 1,300 members located throughout the United States.  Through agency proceedings, public education, scientific studies, and legal advocacy conducted by its staff, members, volunteers, and supporters, WWP is actively engaged in protecting and improving riparian areas, water quality, fisheries, wildlife, and other natural resources and ecological values of western watersheds.  WWP has participated in decision-making processes for livestock grazing on Forest Service lands across the West, including all of the forests at issue here.  WWP has been involved in many public and private efforts to protect these national forests from harmful impacts of livestock grazing and to preserve or restore their special resources, including endangered, threatened, and sensitive species.  WWP staff, members, and supporters regularly use and enjoy the wildlife, public lands, and other natural resources on the Caribou-Targhee, Bridger-Teton, and Uinta-Wasatch-Cache National Forests, including the areas on these forests at issue here, for many health, recreational, scientific, spiritual, educational, aesthetic, and other purposes.  WWP staff, members, and supporters pursue activities such as hiking, fishing, hunting, wildlife viewing, biological and botanical research, photography, and spiritual renewal on these National Forest lands.  WWP's staff, members, and supporters will continue frequently to visit these National Forests, including the areas affected by the decisions at issue here, in the near future and beyond for these pursuits.  Livestock grazing that degrades these areas and their natural resources impairs the use and enjoyment of these resources by WWP staff and its members.

12.     Plaintiff CENTER FOR BIOLOGICAL DIVERSITY ("CBD") is a non-profit corporation dedicated to the preservation, protection, and restoration of biodiversity, native species, ecosystems, and public lands throughout the United States.  CBD has offices across the United States, and more than 40,000 members nationwide.  CBD uses science, law, advocacy,

and public outreach and education to protect the lands, water, and climate that native species need to survive in order to protect biodiversity, particularly those species on the brink of extinction.  CBD actively participates in activities throughout the United States to protect native species and their habitat from livestock grazing.  CBD has been actively engaged in management decisions for the Caribou-Targhee National Forest, especially with regard to livestock grazing on and around the U.S. Department of Agriculture sheep station.  CBD staff and individual members use and enjoy the Caribou-Targhee National Forest, including areas on the forest at issue here, for hiking, biking, nature and wildlife viewing, photography, spiritual renewal, solitude, and other recreational, educational, aesthetic, and spiritual purposes.  CBD's staff, members, and supporters will continue to visit the Caribou-Targhee National Forest, including areas affected by the decisions at issue here, in the near future for these pursuits.   Livestock grazing that harms native species and their habitat impairs the use and enjoyment of these areas by CBD staff and its members.

13.     Plaintiff GRAND CANYON TRUST is a regional, non-profit conservation organization whose mission is to protect and restore the Colorado Plateau of southern Utah and northern Arizona and the spectacular landscapes, rivers, plant and animal diversity, and beauty found there.  Grand Canyon Trust uses collaboration, advocacy, science, and litigation to promote responsible management of public lands on the Colorado Plateau.  Grand Canyon Trust has offices in Moab, Utah and Flagstaff, Arizona and members throughout the nation.  Grand Canyon Trust has been engaged in livestock grazing management decisions in Utah for many years, including decisions on the Fishlake and Manti La Sal National Forests.  Trust members and staff regularly use and enjoy the Fishlake and Manti La Sal National Forests, including the areas at issue in this litigation, for recreation, sightseeing, aesthetic beauty, solitude, and

scientific study.   Trust members and staff plan to continue to use these areas regularly and in the near future for these pursuits. Grazing that degrades the natural resources of these areas on the Fishlake and Manti La Sal National Forests impairs the use and enjoyment of these lands for Grand Canyon Trust staff and members.

14.     Plaintiff UTAH ENVIRONMENTAL CONGRESS ("UEC") is a Utah non-profit conservation organization based in Salt Lake City, Utah.  UEC's mission is to maintain, protect, and restore the native ecosystems on public lands within Utah.  UEC participates in public land management for national forests throughout Utah, including the Uinta-Wasatch-Cache, Manti La Sal, and Fishlake National Forests.  UEC has been active in promoting proper grazing management on these three forests for many years.  UEC staff, members, and supporters routinely visit these forests, including the lands at issue here, for recreation, photography, solitude, scientific study, and to enjoy the biological diversity and harmony of the natural ecosystems there.  UEC staff, members, and supporters will continue to visit these lands in the near future and beyond to pursue their recreational, aesthetic, spiritual, and scientific activities. Livestock grazing that harms the native ecosystems as well as recreation opportunities of these areas within the Uinta-Wasatch-Cache, Manti La Sal, and Fishlake National Forests impairs the use and enjoyment of these lands for UEC staff, members, and supporters.

15.     The above-described aesthetic, conservation, recreational, scientific and other interests of Plaintiffs and their staff, members and supporters have been, are being, and, unless the relief prayed for is granted, will continue to be adversely affected and irreparably injured by Defendant's violations of law.  Plaintiffs have no adequate remedy at law, and thus the requested relief is appropriate.

16.     Defendant UNITED STATES FOREST SERVICE is an agency or

instrumentality of the United States, and is charged with managing the public lands and

resources of the National Forests, in accordance and compliance with federal laws and

regulations.

## LEGAL BACKGROUND

### A.    National Environmental Policy Act

17.    As our nation's basic environmental charter, NEPA requires federal agencies to

undertake a thorough and public analysis of the environmental consequences of proposed federal

actions, including preparing a detailed EIS for all major Federal actions that may significantly

affect the quality of the human environment.  An EIS must consider a range of reasonable

alternative actions and assess site specific and cumulative impacts of these actions.  42 U.S.C. §

4332(2)(C).  Cumulative impacts are the past, present, and reasonably foreseeable future actions

that must be assessed, in combination with the proposed action, to determine the potential for

significant impacts to the environment.  40 C.F.R. § 1508.7.

18.    Under federal regulations, agencies may prepare an EA to assist in the NEPA

process.  40 C.F.R. § 1508.9.  An EA is a more limited review of environmental factors

associated with a federal action, performed to assist the agency in determining whether an EIS is

warranted.

19.    NEPA also provides for public input into the decision-making process, and Forest

Service regulations allow the public to appeal final EA or EIS decisions.  40 C.F.R. §§ 1503.1,

1506.6; 36 C.F.R. Part 215.  As noted by the Supreme Court, NEPA requires an agency to: (1)

take a "hard look" at the environmental consequences of its proposed action before proceeding

with implementation of the action, and (2) encourage public involvement in the decision-making

process.  *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 350 (1989).

20.     The issuance or renewal of a federal livestock grazing permit is a major federal

action that triggers NEPA review.  *See, e.g., Natural Resources Defense Council v. Morton*, 388

F. Supp. 829 (D.D.C. 1974), *aff'd without opinion*, 527 F.2d 1386 (D.C. Cir. 1976); *Idaho*

*Watersheds Project v. Hahn*, 307 F. 3d 815 (9th Cir. 2002).

**B.     2005 Appropriations Rider**

21.     In the fiscal year 2005 appropriations bill, Congress passed a rider that allowed

the Forest Service categorically to exclude grazing reauthorizations in fiscal years 2005 through

2007 from documentation in an EA or EIS if:  "(1) the decision continues *current grazing*

*management*; (2) monitoring indicates that *current grazing management* is meeting, or

satisfactorily moving toward, objectives in the land and resource management plan, as

determined by the Secretary; and (3) the decision is consistent with agency policy concerning

extraordinary circumstances."  FY 2005 Consolidated Appropriations Act, Sec. 339 (Pub. L.

108-447) (emphasis added).  The total number of allotments authorized under this rider could not

exceed 900.

22.     The Forest Service used the rider to exclude hundreds of permit renewals from

environmental review under either an EA or an EIS, including dozens in the last month before

the rider expired.  But, even with this last rush of excluded renewals, the Forest Service did not

reach its target of 900 allotments, and Congress extended the rider for fiscal year 2008.  FY 2008

Consolidated Appropriations Act, Sec 421 (Pub. L. 110-161).   Congress also added the

limitation that a categorical exclusion could not be used for any allotment within a federally

designated wilderness area.

23.     Under the rider's first requirement, the categorically excluded decision must

continue *current grazing management*.  It cannot authorize more grazing or grazing under

different circumstances than what is presently taking place.  The Forest Service's internal guidelines interpret "current management" to mean the management that has been implemented over the past three to five years.  *See* Forest Service Handbook 2209.13, 92.31.

24.     The rider's second requirement ensures that a decision will be categorically excluded only when the Forest Service has monitoring information showing that current grazing management is meeting, or satisfactorily moving toward, land and resource management plan objectives.  Each forest or group of forests has its own Land and Resource Management Plan ("Forest Plan"), which sets forth desired conditions, goals, standards and guidelines for various resources on the forest such as fish and wildlife, vegetation, soils, water, recreation and cultural resources.

25.     The rider's third requirement is that the categorically excluded decision must comply with the Forest Service policy on extraordinary circumstances, which is found in the Forest Service Handbook, chapter 1909.15.30.3.2.  In determining whether extraordinary circumstances exist, the Forest Service must first determine whether certain resource conditions are present in the action area.  Those resource conditions are:  a) federally listed threatened or endangered species or designated critical habitat, species proposed for federal listing or proposed critical habitat, or Forest Service sensitive species; b) flood plains, wetlands, or municipal watersheds; c) congressionally designated areas, such as wilderness, wilderness study areas, or national recreation areas; d) inventoried roadless areas; e) research natural areas; f) American Indian and Alaska Native religious or cultural sites; or g) archaeological sites, or historic properties or areas.  Next, the Forest Service must assess the "degree of potential effect of the proposed action on these resource conditions" to determine whether extraordinary circumstances exist.  The Forest Service must demonstrate that there will be no significant effects on any of

COMPLAINT - 10

these special resource conditions to avoid preparing an EA or EIS.

## C.    Administrative Procedure Act

26.    The APA provides for judicial review of agency actions, and calls for the reviewing court to hold unlawful and set aside actions that are arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law; or that are in excess of statutory authority; or that were made without observance of procedure required by law.  5 U.S.C. § 706(2).

27.    As demonstrated below, the Forest Service has violated Section 706(2) of the APA by issuing the decisions challenged herein as categorical exclusions, when they do not meet all of the requirements for exclusion set forth in the 2005 appropriations rider.

## FACTUAL BACKGROUND

## A.    Impacts of Livestock Grazing

28.    Livestock grazing by cattle and sheep dramatically alters native ecological communities and damages habitat for a multitude of fish, wildlife, and plant species.  Grazing harms both upland and riparian communities[2] by degrading vegetation, soils, and streams.

### 1.    Impacts on upland communities

29.    Upland plant communities impacted by grazing include meadows, aspen stands, grasslands, tall forb communities (forbs are non-woody broad-leaved flowering plants – commonly called wild flowers), sagebrush communities, and forests with undergrowths of grass, forbs, and shrubs.  Livestock consume large quantities of vegetation, impacting not only plant growth, but also species diversity and composition, the seral state[3] and vigor of plants, and the

---

[2] Upland communities refer to dry plant communities that are not adjacent to water sources. Riparian communities refer to areas adjacent to water sources such as rivers, streams, ponds, lakes, seeps, springs, bogs, fens, or wet meadows, which normally contain lush, highly productive vegetation.

[3] The seral state of a plant refers to its successional status—*i.e.*, whether it is an early colonizer of an area that was recently disturbed, or a "climax" plant that appears in a mature community.

prevalence of weeds.  Trampling of vegetation adds to the adverse impacts of grazing when livestock crush and displace plants and damage woody shrubs.

30.     One of the primary adverse effects of livestock grazing is its alteration of plant diversity and composition.  Cows and sheep generally prefer to eat native grass and forb species. By selectively grazing these plants and eating their seed heads and flowers, livestock reduce seed production and regeneration of native plants.  In turn, non-native or invasive species that are unpalatable to livestock or more tolerant of grazing quickly take root and spread in their place. Many rangelands in the western United States are now in poor ecological condition because livestock grazing has eliminated the natural and healthy diversity and abundance of native grasses, forbs, and shrubs, allowing invasive species to take over.  This can also reduce the productivity of the area for forage.

31.     Invasive species, such as cheatgrass, Kentucky bluegrass, crested wheatgrass, scotch broom, and other exotic weeds, are often of lower value to watershed health and wildlife. Furthermore, invasive plants can lead to increased use of herbicides, forest health problems, and altered fire cycles.  One dramatic example is the expansion of cheatgrass across the West, which has increased wildfire frequency and intensity.

32.     Livestock also trample and break the branches off woody shrubs, reducing their vigor and eliminating canopy cover on which many wildlife species depend.  Heavy browse of young shrubs and saplings prevents regeneration and recruitment of new woody shrubs, aspen, and cottonwood, leaving only decadent stands of old shrubs and trees.[4]

33.     Further, grazing reduces the density and vigor of grasses and forbs in forested

---

[4] A shrub or tree is decadent when it is in a state of decline.

areas.  By removing the herbaceous vegetation understory[5] that normally outcompetes tree seedlings, grazing leads to thick stands of small trees that increase the risk of wildfire.

34.     Grazing also greatly impacts soil conditions, significantly altering biological communities and the hydrology of watersheds.  First, livestock deplete vegetation, leaving the ground bare.  Then they disturb the bare ground with their hooves, creating a bed ready-made for the growth of quickly-spreading noxious weeds and other invasive species, the seeds of which livestock carry in their hooves, guts, or hair.

35.     Second, increased bare ground, combined with livestock disturbance and destruction of biological soil crusts, leads to erosion when loose soil is transported by wind, or by overland water flows during rain events or snowmelt.  This erosion causes rills (small rivulets in the soil), gullies (channels in the soil formed by moving water), and pedestalling of plants (soil loss around the base of plants, making them appear elevated).

36.     Further, livestock trampling compacts soils, reducing water infiltration and increasing surface water run-off that carries away the topsoil no longer protected by soil crusts.  Often this topsoil ends up as sediment in streams.

37.     When less water permeates the soil due to compaction, water storage capacity is reduced, which can be particularly stressful to plants and animals in times of drought.  Soils dry out faster, impairing plant productivity.  Later in the summer, less groundwater is available, causing stream flows to diminish or dry up completely.

**2.     Impacts on riparian communities**

38.     Although riparian areas, such as perennial streams, seeps, springs, intermittent streams, wet meadows, bogs and fens, make up a tiny percentage of the rangelands of the West,

---

[5] Herbaceous vegetation are plants lacking a woody stem.

they provide critical habitat for fish, wildlife, and sensitive plant species.  Riparian areas enjoy greater biodiversity than any other plant community because of their rich, moist soils and multi-layered vegetation.  Unfortunately, because riparian areas provide water, food, and shade, they also disproportionately attract livestock, especially cattle, which then damage these areas.

39.     As with upland communities, livestock deplete vegetation and alter plant diversity and composition in riparian communities by selectively grazing native vegetation and allowing less-desirable invasive species to spread.  Livestock also impact the survival and the age-diversity of trees and woody shrubs in riparian areas, by browsing saplings and young shrubs.  Furthermore, grazing and trampling increase bare ground and compact wet soils, causing these sites to become drier, which in turn reduces plant productivity and converts species from lush riparian vegetation to dry-site vegetation.

40.     The depletion of native riparian vegetation and compaction of wet soils also reduces water infiltration, which decreases the water storage capacity of wet meadows, fens, springs and seeps, and streamside riparian areas.  This loss of infiltration significantly impacts the hydrology of a watershed, creating higher peak flows of surface run-off that scour stream channels and erode streambanks during snowmelt and rain storms.  At the same time, the loss of groundwater lowers the water table, which leads to dried up streams later in the season.

41.     The Forest Service's increasing reliance on water developments, which pipe water from natural springs into troughs for livestock to drink, lowers the water table even more.  The drying out of riparian areas increases as livestock grazing impacts are added to the effects of global warming, seriously altering the hydrologic regime of our western watersheds.

42.     Livestock also directly impact water quality when they walk in streams and graze and trample streambanks.  Urine and manure deposited directly into streams or carried into

COMPLAINT - 14

streams through run-off increase the bacterial and nutrient contents in the water, which in turn reduces dissolved oxygen.  When livestock walk in streams, they also stir up the sediment of the stream bed, creating higher turbidity levels.

43.    Trampling and grazing of streambanks lead to erosion and increased sediment. Livestock destabilize banks when they trample them or eat riparian vegetation, which typically have deep, stabilizing root systems.  Denuded and destabilized banks easily erode and deposit sediment into stream channels.  Grazing of riparian vegetation also reduces its effectiveness at trapping the sediment carried in overland run-off.  Increased sediment leads to shallower and warmer streams, and reduces the frequency and quality of pools, while bank trampling and sloughing[6] reduce undercut banks and meanders, creating wider, straighter streams with higher water velocity.

### 3.    Impacts on fish, wildlife and plant habitat

44.    The adverse impacts of livestock grazing on upland and riparian communities described above have significant ramifications for the fish, wildlife, and plant species that inhabit these communities.

45.    Aspen stands, which often grow on the edge of meadows, are second only to riparian areas in their native biodiversity.  These stands provide habitat for migratory and resident birds, including sensitive species like goshawks and flammulated owls.  Livestock browse and kill young aspen stems, preventing them from regenerating or becoming overstory and causing significant decline of existing aspen stands.  In addition, when livestock graze the grass and forb understory and disturb the soil in these stands, conifer encroachment increases.

---

[6] Bank sloughing occurs when a part of the streambank breaks away and "sloughs" off, due to livestock walking along the edge of the bank.  These chunks of streambank then erode into the stream channel.

Conifer stands have replaced aspen stands all across the West, causing a loss of important habitat for many wildlife species.

46.     The grazing of understory plants in forested areas, as well as in meadows and grasslands, also impairs the habitat of small mammals and invertebrates.  These species require tall grasses and forbs for protection and food, but livestock grazing reduces the value of these plants to wildlife and often converts native plant species to species that are less valuable to wildlife.  Livestock also trample the nests and young of small mammals and compact the soil, making it more difficult for burrowing animals to survive.  Population declines of small mammals and invertebrates caused by livestock, in turn, adversely impact predatory species such as goshawks, great gray owls, bats, and lynx, all of which are now in decline.

47.     Similarly, livestock grazing of tall forbs impacts the species that rely on these plants.  Many forbs produce flowers that provide food for pollinators like hummingbirds and bees.  When livestock eat these forbs, it eliminates pollinators' food source and impairs the productivity and reproduction of more forbs.  As the native forbs disappear, they are replaced by plants that do not support pollinators.

48.     In recent years the sage-steppe ecosystem in the western United States has decreased dramatically.  Most of what remains faces adverse impacts from livestock grazing.  This ecosystem did not historically support herds of large, grazing ungulates and the native vegetation developed without significant grazing pressure, making it particularly sensitive to livestock grazing.

49.     Sagebrush or sage-steppe communities provide habitat for many wildlife species, such as sage-grouse.  The sage-grouse is in serious decline and is warranted for listing as threatened under the Endangered Species Act.  Myriad other mammals, birds, and reptiles inhabit

sage-steppe communities, including species of concern such as the pygmy rabbit, Brewer's sparrow, sage sparrow, sagebrush vole, and pronghorn antelope.

50.     Grazing these sagebrush communities harms the species that depend on these shrubs, as well as the grass and forb understory beneath the sage shrubs, for cover and forage. Ground nesting birds such as sage-grouse or Brewer's sparrow rely on dense sagebrush canopy cover as well as tall grasses and forbs under the shrubs to protect their nests from predators. Pygmy rabbits use sagebrush to hide from predators by climbing up into the shrubs.  Both sage-grouse and pygmy rabbits also rely exclusively on sagebrush for food in winter.  Livestock damage sagebrush by breaking their branches, removing canopy cover and eliminating the brush as a food source for wildlife.  They also trample and browse young shrubs, preventing regeneration.  And, livestock graze the understory of tall grasses and forbs beneath shrubs, eliminating this cover and forage and often converting the plants to invasive species that are less valuable for wildlife.

51.     Livestock also trample nests, burrows, and even small creatures in shrub communities, and can disturb and displace wildlife from nesting, brooding, and over-wintering sites.

52.     These impacts often occur near range "improvements," such as fences, corrals, or water developments that provide water from springs or stock ponds.  The disturbance caused by livestock is intense even a mile or more from these structures, interrupting and fragmenting habitat for native birds and wildlife.  In addition, fences needed for livestock management provide perches for raptors that prey on sage-grouse and other birds.   Fences also disrupt the migration or food search of larger mammals, like deer, elk, and pronghorn.

53.     As noted above, riparian areas provide the greatest biodiversity of any

COMPLAINT - 17

community, but receive disproportionately higher adverse impacts from livestock grazing. Impacts to streams and their channels adversely affect fish, especially those species that require clean, cold water for survival like salmon, steelhead, and native trout species.  Many species of salmon, steelhead, and trout are at risk because of habitat degradation.  Livestock degrade fish habitat when they trample spawning beds, reduce streamside vegetative cover and shade, and cause increases of sediment and other pollutants, leading to higher water temperatures, algae blooms, and fewer pools and undercut banks that provide cover and refuge for fish.

54.     Aquatic macroinvertebrates (insects), many of which also require cold water with little sediment or pollutants, suffer from these same impacts.  Moreover, both aquatic and terrestrial insects rely on riparian plants for their food source.  Grazing reduces the amount and diversity of streamside vegetation, reducing this primary food source.  Loss of invertebrate abundance and diversity in turn affects fish that prey on these insects.

55.     Livestock grazing of streamside vegetation and woody shrubs also affects bird, mammal, and amphibian species.  Many birds and mammals rely on the complex vegetative structure of riparian areas for cover and food.  By browsing and damaging woody shrubs and trees, particularly willow and cottonwood, livestock reduce the amount and quality of cover and nesting sites for these birds and mammals.  Beaver cannot create water-conserving dams when livestock deplete their food source (largely willows).  The grazing and trampling of herbaceous vegetation reduces cover for amphibians, and alters the plant diversity of the area by removing native species and replacing them with less valuable invasive species.

56.     Other wetlands, such as seeps, springs, fens, and wet meadows, provide specialized riparian habitat for many different plants and animals.  Wetlands are habitat for aquatic species, a water source for terrestrial animals, and a source of food and cover for birds,

reptiles, amphibians, and mammals.  Seeps and springs often support unique plant and animal species.  In fact, approximately 200 endemic vertebrate and invertebrate species as well as hundreds of plants, many of which are designated as threatened or sensitive, occupy only these habitats.

57.     Because wetlands are drying out or degraded, many of the plants, amphibians, and macroinvertebrates that rely on them are now in decline.  For example, large numbers of frogs and toads are now listed as threatened or sensitive.  Species that depend on these habitats at certain times of the year are also adversely impacted, such as migratory birds and sage-grouse.  In late summer, after vegetation in their upland habitat has dried out, sage-grouse depend upon forbs around seeps and springs for food during their late brood-rearing period.

58.     Livestock using these highly critical wetland areas not only step on nests and small animals, they also destroy habitat by trampling and grazing the vegetation, compacting and drying out soils, and impairing water infiltration, all of which reduces water storage and plant productivity and converts wetlands into drier sites.

59.     Even fencing off springs and pumping water to upland troughs adversely impacts wildlife because these water developments prevent large animals from accessing the vegetation and water around springs, and remove water that would normally keep the soils moist, retain high plant productivity, and later contribute to stream flows.

60.     Finally, grazing even harms large wildlife in various ways.  Livestock compete with deer and elk for forage.  In addition, when livestock move to riparian areas and aspen stands to graze, they often displace deer and elk which use these areas as their primary cover.

61.     Bighorn sheep compete with livestock for forage as well, but the bigger problem for them is the transmission by domestic sheep of fatal respiratory disease.  Contact between

COMPLAINT - 19

domestic and bighorn sheep often causes pneumonia in bighorns, leading to large die-offs of bighorn herds. Bighorn populations have declined dramatically from their historic numbers and continue to struggle due in large part to disease caused by contact with domestic sheep.

62.     Even wolves and grizzly bears are indirectly impacted by livestock grazing through policies of relocating or killing wolves or bears that kill domestic sheep or cows grazing upon federal public lands. This policy has led to the killing of more than 600 gray wolves as well as numerous grizzly bears since the mid-1990's because of conflicts with livestock on public land. As wolves and grizzly bears expand their range, the conflicts with domestic livestock will increase.

### 4.     Impacts on cultural resources

63.     National forest lands in the western United States contain many historic and prehistoric sites from early white settlers and Native Americans, and the Forest Service is charged with preserving and protecting these sites. These sites consist of artifacts or structural remains from early homesteads; historic or prehistoric trails, roads, and inscriptions on trees and rocks; as well as Native American artifacts, structures, lithic scatters, and sacred sites.

64.     Livestock trample and bed down on artifacts. They also disturb and erode soil that covers artifacts, displace artifacts, and degrade sacred sites. These impacts are particularly likely in heavy use areas such as salting or bedding grounds, trailing routes, water developments, or along fencelines.

### 5.     Impacts on Wilderness

65.     Under the 1964 Wilderness Act, Congress has preserved more than 105 million acres of land across the United States to protect some of the last remaining wild places in the country. 16 U.S.C. §§ 1131-1136. The purpose of the Act was to preserve and protect Federal

lands in their natural condition, for future use and enjoyment *as wilderness*.  *Id.* § 1131(a).

66.     The Wilderness Act defines wilderness as:

> An area where the earth and its community of life are untrammeled by man;
>
> An area of undeveloped Federal land retaining its primeval character and influence, without permanent improvements or human habitation, which is protected and managed so as to preserve its natural conditions;
>
> An area that generally appears to have been affected primarily by the forces of nature, with the imprint of man's work substantially unnoticeable; and
>
> An area that has outstanding opportunities for solitude or a primitive and unconfined type of recreation.

*Id*. § 1131(c).  Further, these areas shall be devoted to the public purposes of recreation, scenic, scientific, educational, conservation, and historic use.  *Id.* § 1133(b).

67.     The Act allows for the continuation of livestock grazing within wilderness areas where that use was established prior to the designation of an area as wilderness, subject to regulation by the Forest Service.  *Id.* § 1133(d)(4)(2).  Further Congressional guidance states that the Forest Service will not curtail or phase-out grazing simply because of a wilderness designation, but can adjust livestock numbers during its planning process to protect wilderness resources from deterioration.  Pub. L. No. 96-560, Sec. 108.

68.     Livestock undermine the natural conditions and primitive recreation value of these wild places by degrading them as described above.  Livestock also can turn hiking trails into wide, muddy, manure-fouled avenues that are unappealing, prone to erosion, and infested with noxious weeds.  They also can ruin wilderness campsites.  Wilderness users often camp near lakes or streams, which are areas heavily used by livestock that foul the waters, deposit manure, and trample the vegetation and soils at these sites.

69.     Livestock also graze and trample the open meadows and alpine areas sought after

by the public for their scenic beauty.  The majority of recreational users dislike livestock in wilderness areas, and signs of cattle or sheep reduce their feeling of solitude and their enjoyment of wild scenic beauty.

70.     In sum, livestock grazing adversely impacts our natural resources in many different ways.  Yet, the Forest Service often has either never assessed these impacts, or has not done so for many years.  In the meantime, numerous native fish, wildlife, and plant species have been in serious decline or face extinction, weeds have increased, riparian destruction has increased, and global warming (to which cattle contribute) grows as a threat.  Now, the Forest Service is relying improperly on the 2005 appropriations rider to escape its obligation under NEPA to conduct in-depth site-specific environmental analysis and involve the public in ten-year-long grazing decisions on many allotments covering hundreds of thousands of acres of public lands within Forest Service Region 4, lands that contain wilderness areas, imperiled species, key wildlife habitat, and cultural resources.  In many instances these easy grazing reauthorizations do not meet the criteria of the rider and are unlawful.

**B.     Violations of the 2005 Appropriations Rider**

71.     The 2005 appropriations rider contains three requirements that the Forest Service must satisfy to reauthorize grazing under a categorical exclusion ("CE"), as noted above.  Instead of carefully picking grazing allotments that meet these requirements, the Forest Service is using the rider to reauthorize grazing allotments in highly sensitive areas.

72.     The agency's violations of the rider fall into several patterns described below.

**1.     The rider's first requirement**

73.     Under the rider's first requirement, the CE decision must "continue current grazing management."  Evidently, the Forest Service has interpreted this requirement to allow it

to authorize grazing at levels allowed under a previous permit even when no grazing or significantly reduced grazing occurred on the allotment for several years prior to the CE decision.  Not only does this interpretation contradict the plain meaning of "*current grazing management*," it also contradicts the Forest Service's own handbook and policy guidance, which state that current management means the management implemented *over the last three to five years* through Allotment Management Plans or Annual Operating Instructions.

74.     Several of the challenged CE decisions here authorize grazing on allotments where reduced or no annual grazing occurred several times within the previous five years.  By using a CE to reauthorize grazing at levels much higher than the grazing actually implemented over the last five years, the Forest Service is not continuing current grazing management.  Moreover, any up-to-date monitoring of these grazing allotments is relevant only to assess conditions when livestock use has been nonexistent or significantly less than permitted; such monitoring cannot provide meaningful data to support the level of livestock reauthorized.

### 2.     The rider's second requirement

75.     The second condition of the rider is that "monitoring [must] indicate[] that current grazing management is meeting, or satisfactorily moving toward, objectives in the land and resource management plan."  To satisfy this requirement, the Forest Service must actually have monitoring data *and* this data must demonstrate that the *current grazing* is not unduly harming resources on the grazing allotment at issue.  All of the CE decisions here violate this requirement because the Forest Service either lacks relevant monitoring data or the data shows that conditions are degraded as a result of continued livestock grazing.

76.     The referenced land and resource management plan objectives come from individual Forest Plans.  These plans set forth desired conditions, goals, standards and guidelines

for maintaining or restoring properly functioning ecosystems; promoting ecologically healthy and diverse vegetation, soils, water resources, and fish and wildlife habitat; and protecting species of concern and cultural resources.

77.     The monitoring information needed to demonstrate that forests are meeting or moving toward these objectives consists of information from studies of the effects of grazing on upland communities, riparian communities, and fish and wildlife habitat.  But, in many cases, the Forest Service does not have monitoring data to assess adequately the impact that grazing has on the health of rangelands and their associated wetlands, habitat, and inhabitants, and thus cannot be used to demonstrate that current grazing management is meeting or moving towards all land and resource management plan objectives.

78.     For example, to measure the impacts grazing has on upland plant communities, monitoring must assess, among other things, plant diversity, composition, age-structure, and vigor; presence and growth of invasive species or noxious weeds and any resulting change in forage productivity; condition and amount of woody shrub cover; amount of bare ground; condition of microbiotic soil crusts; and the presence of compacted soil or signs of erosion. Moreover, monitoring only one type of plant community, which is frequently what the Forest Service does, is not sufficient to assess the impact to all upland habitats. Monitoring one sagebrush community, for instance, does not provide meaningful data about other types of shrub communities and certainly cannot provide information about impacts to aspen or other forested areas, dry meadows and grasslands, or forb communities.  In some cases, the Forest Service has conducted the widespread monitoring necessary to assess the impact of grazing on individual allotments.  In the CE decisions challenged here, however, such data is lacking.

79.     Similarly, because livestock spend so much time in riparian areas and impact

them so heavily, the Forest Service must monitor these areas when they are present in an allotment.  Appropriate monitoring must analyze riparian vegetation condition, diversity, and composition for herbaceous species and woody shrubs, as well as soil conditions.  In addition, because livestock erode streambanks, the monitoring must measure bank stability and water quality.  Nor can the monitoring focus solely on perennial streams, which are only one kind of riparian habitat; it also must consider the effect of grazing on wet meadows, springs, seeps, fens, and intermittent streams.

80.     Fish, wildlife, and plants have a variety of habitat needs distinct from those of livestock and require additional monitoring to assess whether grazing is impairing those needs. In upland sagebrush communities, monitoring must take into account wildlife needs such as sagebrush canopy cover and tall residual native grasses and forbs under shrubs.  In aspen, meadow, and forb communities, the monitoring must track whether livestock are preventing regeneration of key species or grazing and trampling herbaceous vegetation too heavily to provide adequate protection and food for wildlife.  Plants grazed to three to five inches or less do not provide adequate cover for many wildlife species or flowers for pollinators.

81.     In riparian areas, it is crucial to assess livestock grazing impacts on the habitat of fish, insects, migratory birds, amphibians, mammals, and sensitive plant species.  To assess conditions for fish and macroinvertebrates, instream monitoring must consider sediment and other pollutant loads; water temperature; the presence of cover in the form of deep pools, undercut banks, overhanging vegetation, and woody debris; width–to–depth ratios; and channel substrate.  For terrestrial species, monitoring must assess whether enough forage and cover exist in the form of woody shrubs, trees, and herbaceous plants.

82.     The Forest Service generally recognizes the importance of this kind of

COMPLAINT - 25

monitoring, yet, in many instances it has not adequately completed it, or undertaken it at all.  The Forest Service often lacks monitoring data for condition of upland communities, and when it has collected information, it often has collected this data only recently or sporadically, and thus has no way of knowing whether livestock grazing is causing conditions to improve, remain stable, or degrade over time.

83.    Second, monitoring for riparian areas is also inadequate for many of these CE decisions because the Forest Service collects up-to-date information for only a small percentage of streams covered under its decisions, and it has collected virtually no information on the conditions of seeps, springs, wet meadows, or intermittent streams.  Even for those areas that the Forest Service has monitored, it has not collected data for many important riparian or instream variables.

84.    Third, the Forest Service has issued CE decisions having very limited or no monitoring information on fish, wildlife and plant species and their habitat.  For many species, including multiple sensitive species and Management Indicator Species,[7] the Forest Service often has not conducted surveys of grazing allotments to determine whether the species is present, its location, and its population trend.  Moreover, the Forest Service rarely has adequately surveyed habitat conditions for fish, wildlife, or plant species, despite acknowledging that suitable habitat for certain species exists on the allotment and that livestock grazing can impact that habitat.

85.    Finally, some of the Forest Service's CE decisions do not comply with the rider's second requirement because the monitoring actually shows that livestock grazing is causing serious damage.  The agency has issued decisions even when its monitoring information

---

[7] Management Indicator Species are species selected by the Forest Service to represent a suite of species that all use similar habitat.  By monitoring population trends and impacts to these indicator species, the Forest Service presumes similar trends and impacts are occurring for other species in that habitat.

indicates degraded upland and riparian conditions caused by livestock grazing.

### 3.      The rider's third requirement

86.      Under the rider's final requirement, the Forest Service's CE decisions must be consistent with the agency's policy on extraordinary circumstances.  As discussed above, this policy looks at whether certain resource conditions, including endangered, threatened, and sensitive species, wetlands, cultural resources, and wilderness areas, are present and the degree of potential effect on these resource conditions.

87.      Many of the allotments covered under the CE decisions contain these special resource conditions.  Yet, for the challenged decisions, rather than analyze the impact of continued grazing, the Forest Service has summarily concluded—with little or no analysis and data whatsoever—that acknowledged impacts on these special resources do not amount to extraordinary circumstances.

88.      For instance, multiple allotments occur in wilderness areas but the Forest Service ignores grazing impacts that are occurring to wilderness values.

89.      Similarly, the Forest Service decisions frequently acknowledge that grazing harms wetlands, cultural resources, and imperiled species, and that these resources exist on the allotments.  Still, in the face of these facts, the decisions simply assert the unsupported conclusion that continued grazing will not have significant impacts to these special resources.

90.      Moreover, the Forest Service has completely neglected to assess the cumulative impacts of grazing other allotments in the same forest.  Thus, the Forest Service's assertion that a specific grazing decision will not impact *overall* populations of sensitive species, or *overall* abundance of wetlands does not take into account the cumulative impacts of grazing authorized on additional adjacent or near-by areas.

91.     Because, in many instances, the Forest Service has not demonstrated the absence of extraordinary circumstances despite the presence of special resource conditions and yearly use of those areas by livestock, it has not complied with the rider's third requirement.

92.     The above paragraphs describe the Forest Service's general abuse of the CE rider.  Specific CE decisions challenged by Plaintiffs are described below.  These decisions authorize grazing on several forests within Forest Service Region 4 and each violates the rider in one or more ways.

**C.     Unlawful CEs Issued In Region 4**

**1.     Caribou-Targhee National Forest**

93.     The Caribou and Targhee National Forests joined in 2000 to form one unit, which now covers more than three million acres in eastern Idaho.  This forest borders Montana, Utah, and Wyoming, and is adjacent to Yellowstone and Grand Teton National Parks.  As part of the Greater Yellowstone Ecosystem, this forest contributes to the best remaining habitat in the contiguous United States for a diverse array of species, including grizzly bears, wolves, lynx, wolverines, and other wide-ranging animals.

94.     The Caribou-Targhee National Forest has issued CE decisions covering more grazing allotments than any other forest in the country.  Plaintiffs are challenging three of these decisions that authorize grazing on 35 allotments covering close to 320,000 acres of land on the forest.  These three decisions are:  (1) South Soda CE for 20 allotments dated January 31, 2007; (2) Kelly Canyon/Snakey Canyon CE for six allotments dated April 26, 2007; and (3) Ashton-Island Park 9 CE for nine allotments dated May 8, 2007.

95.     The South Soda and Ashton-Island Park 9 CEs violate the first requirement of the rider.  The Forest Service is not continuing current management under these CEs because it is

reauthorizing previous permit levels for allotments that were vacant, in non-use, or at reduced grazing levels for several years prior to the CE decisions. These violations occur for the following allotments: (1) Diamond/Boulder, Fossil Canyon, Henry Cutoff, Johnson Creek, Lander Creek, Lanes Creek, Maybe Canyon, North Sulphur, Sheep Creek, Slug Creek, Webster Creek, and White Creek (South Soda CE); and (2) Meadowview, Bootjack, Fall River, Fog Butte, and Ripley Butte (Ashton-Island Park 9 CE).

96.     All three CEs violate the second rider requirement because the Forest Service does not have monitoring data showing that grazing is meeting or satisfactorily moving toward Forest Plan objectives. The Forest Service lacks monitoring to assess adequately vegetation conditions and trends of the various upland communities, with *at most* only one upland monitoring site per allotment, no collection of data for many key parameters, and inadequate long-term data to show trends. Many riparian areas, including perennial streams and springs, as well as aspen stands, are also missing long-term monitoring data for key parameters. The data the Forest Service has collected shows upland areas with low or decreasing ground cover and soil impacts, and many streams that are degraded and functioning at risk.

97.     In addition, the Forest Service failed to monitor habitat conditions and assess livestock grazing impacts to many fish, wildlife, and plant species that are known or likely to be on the allotments. The Forest Service did not even acknowledge adverse impacts from domestic sheep grazing on the Snakey Canyon and Kelly Canyon allotments to the struggling bighorn sheep population in the area.

98.     Finally, these CEs do not comply with the extraordinary circumstances policy under the third rider requirement. The Forest Service has not demonstrated that continued grazing will not harm the many imperiled species likely found on these allotments, including

wolves, grizzly bears, lynx, sage-grouse, Columbia sharp-tailed grouse, pygmy rabbit, great gray owl, goshawk, Columbia spotted frog, Yellowstone cutthroat trout, and sensitive plants. Considering the impacts of grazing all these allotments as well as the many other allotments on the forest and in this ecosystem, the cumulative impacts from grazing create significant effects to all of these species. Finally, the Forest Service has also failed to survey and discuss the impacts to cultural resources from grazing these allotments.

### 2. Bridger-Teton National Forest

99. Just east of the Caribou-Targhee National Forest is the Bridger-Teton National Forest, comprising another large part of the Greater Yellowstone Ecosystem. This 3.4 million acre forest contains extensive wilderness areas in the Wind River mountain range as well as significant wildlife habitat near Grand Teton and Yellowstone National Parks.

100. Like the Caribou-Targhee National Forest, the Bridger-Teton National Forest issued numerous CE decisions for grazing allotments across the forest. Combined with the Caribou-Targhee CEs, the Forest Service categorically excluded over 1.23 million acres of livestock grazing within the Greater Yellowstone Ecosystem from environmental analysis.

101. Plaintiffs challenge the following two Bridger-Teton National Forest CEs here: (1) Sweetwater, Blucher Creek, and East Squaw Creek allotments CE ("Sweetwater CE"), dated September 29, 2006; and (2) Southern Wind River Sheep CE covering 14 allotments, dated September 27, 2007.

102. The Forest Service violated the first rider requirement with the Sweetwater CE because the Sweetwater allotment was under non-use for two years and altered use for one year just prior to issuance of the CE. The Forest Service adjusted the season of use and number of livestock in 2005 to try and improve conditions on the ground after noting problems in previous

years.  Thus, this CE did not "continue current management" for this allotment.

103.     These CEs also violate the second requirement of the rider because the Forest Service has failed to collect monitoring information showing that conditions on all of these allotments are meeting or moving toward Forest Plan objectives.  The Forest Service does not have long-term condition and trend data for many key upland and riparian parameters and communities nor short-term utilization data.  Furthermore, the data it has collected shows damage to riparian areas as well as upland soil impacts on numerous allotments.

104.     There is also a significant lack of monitoring for fish, wildlife, and plant habitat to assess current conditions or trends and establish that grazing is meeting or moving toward all Forest Plan objectives for these species.  Even for Management Indicator Species that the Forest Service recognizes are on these allotments and may be impacted by livestock, including elk, deer, pronghorn, bighorn sheep, boreal toad, boreal chorus frog, Brewer's sparrow, rainbow trout, cutthroat trout, and aspen, the Forest Service has little to no data on habitat conditions or population trends and is ignoring conflicts with livestock.  Bighorn sheep in particular are threatened by domestic sheep grazing in the Southern Wind River Range as the population of bighorn sheep in that area has declined to only about a dozen animals.

105.     Third, the Forest Service has violated its extraordinary circumstances policy, contrary to the third rider requirement.  More than 85,000 acres under these two CEs fall within the popular Wind River Range wilderness areas.  Grazing will continue to have adverse impacts to resource values and recreation use in this wilderness but the Forest Service is ignoring those impacts.  The Forest Service also has not demonstrated that grazing is not harming cultural resources on the CE allotments.

106.     Furthermore, these allotments contain habitat for numerous threatened or

sensitive species such as lynx, grizzly bears, wolves, Columbia spotted frog, goshawk, great gray owl, Colorado River cutthroat trout, and multiple sensitive plants, that will continue to be harmed by livestock grazing.  The Forest Service has not considered the cumulative impacts from these two CEs combined with impacts of grazing many other allotments on this and other forests in the Greater Yellowstone Ecosystem that affect the same fish and wildlife populations.

**3.      Uinta-Wasatch-Cache National Forest**

107.    Located in northern Utah, the 2.1 million acre Uinta-Wasatch-Cache National Forest encompasses several majestic mountain ranges, including the High Uinta Mountains. This forest, which contains seven wilderness areas, is increasingly becoming a recreation destination for many outdoor enthusiasts, and one of the most frequently visited forests in the country.

108.    Plaintiffs challenge two CE decisions issued by the Uinta-Wasatch-Cache National Forest reauthorizing domestic sheep grazing on eight allotments covering 90,000 acres within the High Uinta Mountains:  (1) Red Castle, East Fork Blacks Fork, Middle Fork Blacks Fork, Lyman Lake, Little West Fork Blacks Fork, and Elizabeth Mountain No. 2 Allotments CE, dated September 30, 2007; and (2) Gilbert Peak and Hessie Lake-Henrys Fork Allotments CE, dated September 30, 2007.

109.    These two CE decisions violate the 2005 appropriation rider's second requirement.  Monitoring shows that sheep trailing across many of these allotments is causing severe damage to many upland areas in the form of soil erosion and low ground cover, particularly along high use trailing routes and around certain lakes and wetlands.  Soil erosion from the uplands and sheep trailing across streams also has damaged riparian areas by destabilizing streambanks and increasing sediment levels in streams and wetlands.  This damage

COMPLAINT - 32

impairs habitat for fish, macroinvertebrates and amphibians.   And the Forest Service has not even surveyed for macroinvertebrates or amphibians on these allotments in more than ten years, contrary to direction in the Forest Plan.

110.    The High Uintas CE decisions also violate the third rider requirement because grazing will continue to significantly impact resources and recreation use in the High Uintas Wilderness Area as well as along five rivers that are eligible as Wild and Scenic Rivers.  The Forest Service admits that livestock grazing often conflicts with recreation use in the High Uintas Wilderness, and that grazing on several of the allotments at issue here is degrading resources and adversely impacting recreation use in this Wilderness.

111.    Numerous threatened or sensitive animal and plant species also have habitat on the allotments.  High sediment levels and other adverse effects to stream channels will continue to harm sensitive Colorado cutthroat trout, which are generally declining in this area.  Goshawks, great gray owls, lynx, and several sensitive plant species also have habitat on the allotments, and the Forest Service has not shown that grazing is not harming these species.

**4.      Manti La Sal National Forest**

112.     Spanning 1.4 million acres, the Manti La Sal National Forest is divided into three separate areas within southeast Utah.  One of those three areas is the Manti division, which is part of the high Wasatch Plateau.  This plateau ranges from 5,000 to 10,000 feet elevation and contains high elevation lakes, diverse vegetation, many areas of scenic and geologic interest, and key wildlife habitat in the midst of the dry southeast Utah desert.

113.    The Forest Service originally completed an EIS in 2005 to assess grazing impacts across 31 allotments that occur on the Wasatch Plateau, but then withdrew that EIS after several parties, including Grand Canyon Trust and Utah Environmental Congress, filed an administrative

appeal.  Rather than preparing a better EIS, the Forest Service decided to avoid doing NEPA

altogether for 29 of those allotments covering 160,000 acres by issuing a series of eight CE

decisions. [8]  Plaintiffs challenge one of those CEs here: the South Skyline, Booth Canyon, and

Potter Canyon allotments CE, dated September 30, 2007.

114.     This CE violates the second rider requirement because monitoring does not show

that grazing on these allotments is meeting or moving toward Forest Plan objectives.  The Forest

Service's own studies concluded that the South Skyline and Potter Canyon allotments have

moderate to high level of concern for upland conditions due to soil erosion and/or excessive bare

ground, and the Booth Canyon allotment also has problems with bare ground and erosion in the

higher elevations.  Riparian inventories are either outdated or nonexistent for all streams on the

allotments, and no current monitoring of seeps or springs has occurred.  Furthermore, the

outdated data that does exist for the allotments showed impacts from grazing on several streams

and some springs.  The agency also has failed to monitor aspen stands, meadows, and forb

communities, all of which are important wildlife habitat, and has ignored the requirement to

monitor macroinvertebrates, which are the Management Indicator Species for aquatic habitat.

115.     This CE also fails to comply with the extraordinary circumstances policy because

the Forest Service has not shown that grazing on these allotments, combined with cumulative

impacts from grazing the other Wasatch Plateau allotments, is not harming sensitive fish and

wildlife, including goshawks and Colorado cutthroat trout, or cultural resource sites.

### 5.     Fishlake National Forest

116.     The 1.5 million acre Fishlake National Forest is located in central Utah, south

---

[8] As part of the stipulated agreement noted in footnote 1, the Forest Service withdrew one of these CEs and will do an EA or EIS for those allotments. *See* Case No. 08-1460-PJH, Docket No. 102, ¶ 1 (referring to Black Canyon, Clay Banks, Joes Valley, Olsen Bench, Peavine, Reeder Ridge, Ridley Ridge, and Wagon Road Ridge allotments).

and west of the Manti unit of the Manti La Sal National Forest. The mountains and plateaus of the Fishlake National Forest rise above the surrounding desert valleys, and the Forest gets it name from Fish Lake, the largest natural mountain lake in Utah.

117.    The Fishlake National Forest issued CEs for a multitude of grazing allotments across the forest.  Plaintiffs challenge two of those CEs here:  one CE from the Fremont River Ranger District for the 1000 Lakes, Solomon, and Daniels allotments ("Fremont CE") covering 120,000 acres; and one CE from the Richfield Ranger District for the Koosharem allotment covering 36,756 acres.  The Forest issued both of these CE decisions on September 28, 2007, two days before the 2005 appropriations rider expired.

118.    These two CEs violate the second requirement of the 2005 appropriations rider because the Forest Service does not have adequate data to demonstrate that current grazing is meeting or satisfactorily moving toward Forest Plan objectives.  For instance, for the Fremont CE, the Forest Service has little current condition and trend data for uplands, and the limited recent data that does exist shows poor soil conditions and increasing bare soil, low ground cover for native grasses, forbs, and herbaceous plants, and declining sagebrush.  Monitoring information for most riparian areas, particularly seeps and springs, is non-existent.  The Forest Service also has not conducted required monitoring of shrub and aspen browse or wildlife habitat conditions, including for numerous Management Indicator Species and sensitive species with habitat on these allotments.  In fact, the scant evidence that does exist indicates that habitat conditions are not satisfactory for many of these species and aspen browse is excessive.

119.    Likewise, for the Koosharem CE, the Forest Service is largely relying upon outdated information to assess grazing impacts on upland conditions on this allotment.  Much of the existing data is more than nine years old, and the Forest Service has not collected any data to

monitor condition or browse of aspen, as required by the Forest Plan.  The Forest Service has recent riparian data for some of the streams on the allotment and it shows major livestock impacts, including degraded riparian vegetation, unstable streambanks, impaired soils, and overgrazing by cattle.  The forest has failed to monitor condition of and impacts to springs.  It also has little to no monitoring of fish and wildlife habitat for numerous MIS and sensitive species on the allotment.

120.    These two CEs violate the Forest Service's extraordinary circumstances policy because of continued harm from grazing to wetlands as well as to habitat for threatened and sensitive species such as Utah prairie dogs, goshawks, sage grouse, pygmy rabbits, bats, and several species of plants.  The Forest Service has not even monitored habitat conditions and impacts from grazing for most of these species and thus has not adequately assessed or admitted the individual impacts from these CE decisions combined with the cumulative impacts from grazing the many other allotments on the forest.

## FIRST CLAIM FOR RELIEF

### (FOR VIOLATIONS OF THE 2005 APPROPRIATIONS RIDER)

121.    Plaintiffs reallege and incorporate by reference the preceding paragraphs.

122.    The Forest Service has violated section 339 of the FY 2005 Consolidated Appropriations Act, Public Law Number 108-447, by authorizing livestock grazing in the decisions discussed above in paragraphs 93-120 using categorical exclusions, where those authorizations do not meet the terms of this appropriations rider.  Such violations include, but are not limited to:

a.    Authorizing grazing that is greater than or otherwise different from current grazing management, in violation of the rider's first requirement;

b.      Authorizing grazing without having adequate monitoring information to

demonstrate that current grazing management is meeting or satisfactorily moving

toward Forest Plan objectives, or alternatively where monitoring information

shows that current grazing management actually is not meeting or satisfactorily

moving toward Forest Plan objectives, in violation of the rider's second

requirement; and

c.      Authorizing grazing that is not consistent with the Forest Service's policy on

extraordinary circumstances, in violation of the rider's third requirement.

123.      This claim is brought pursuant to the judicial review provisions of the APA, 5

U.S.C. § 706, and the Declaratory Judgment Act, 28 U.S.C. § 2201.

124.      The Forest Service's violations of the 2005 appropriations rider are arbitrary,

capricious, an abuse of discretion, and not in accordance with law under the APA, which has

caused or threatens serious prejudice and injury to Plaintiffs' rights and interests.

## SECOND CLAIM FOR RELIEF

### (FOR VIOLATIONS OF THE NATIONAL ENVIRONMENTAL POLICY ACT)

125.      Plaintiffs reallege and incorporate by reference the preceding paragraphs.

126.      The Forest Service has violated the National Environmental Policy Act, 42

U.S.C. § 4321 et seq., and NEPA's implementing regulations by authorizing livestock grazing in

the decisions discussed above in paragraphs 93-120 without first conducting the necessary

environmental analysis of the impacts of such grazing in an EA or EIS in light of the potentially

significant impacts that each of the challenged CE grazing decisions will have.

127.      This claim is brought pursuant to the judicial review provisions of the APA, 5

U.S.C. § 706, and the Declaratory Judgment Act, 28 U.S.C. § 2201.

128.     The Forest Service's violations of NEPA are arbitrary, capricious, an abuse of discretion, and not in accordance with law under the APA, which has caused or threatens serious prejudice and injury to Plaintiffs' rights and interests.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs pray that the Court grant them the following relief:

A.     Adjudge and declare that the Defendant Forest Service has violated the 2005 appropriations rider; and reverse and set aside the grazing decisions challenged herein as being arbitrary, capricious, an abuse of discretion, and/or contrary to law, pursuant to the judicial review standards of the APA, 5 U.S.C. § 706(2);

B.     Adjudge and declare that the Defendant Forest Service has violated NEPA; and order the Forest Service to conduct an appropriate environmental analysis in an EA or EIS for the decisions challenged herein.

C.     Enter such other declaratory relief, and temporary, preliminary, and/or permanent injunctive relief, as may be prayed for hereafter by Plaintiffs;

D.     Award Plaintiffs their reasonable costs, litigation expenses, and attorneys' fees associated with this litigation pursuant to the Equal Access to Justice Act, 28 U.S.C. § 2412 et seq., and/or all other applicable authorities; and/or

E.     Grant such further relief as the Court deems just and proper in order to provide Plaintiffs with relief and protect the public interest.

Dated:   December 13, 2010                    Respectfully submitted,


                                              _____s/Lauren M. Rule_____
                                              Lauren M. Rule (ISB # 6863)
                                              Attorney for Plaintiffs